REYNALDO G. GARZA, Circuit Judge:
Organizations representing different members of the Houston Police Department sought to intervene in a consent decree entered into by the City of Houston and a class of black and hispanic police officers. The district court denied intervention in the underlying case and also intervention for purposes of appeal. The organizations appeal the denial of these motions and also claim that the consent decree violates Title VII and the Equal Protection Clause of the Fourteenth Amendment.
We find that the district court appropriately denied the motions to intervene in the underlying case; accordingly, we DISMISS those appeals. We find, however, that the district court erred in denying the motions to intervene for purposes of appeal. Therefore, we REVERSE the district court in this matter. Finally, we find that the consent decree survives scrutiny under Title VII and the Equal Protection Clause of the Fourteenth Amendment. Therefore, we AFFIRM the district court’s approval of the consent decree.
I. BACKGROUND
The original Complaint in this action was filed on August 19, 1992, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. *1101 §§ 2000e et seq., as amended by the Civil Rights Act of 1991 and the Equal Employment Opportunity Act of 1972. The plaintiffs in this action filed timely charges of racial discrimination with the EEOC, alleging that the City of Houston’s promotional examinations for the ranks of Sergeant and Lieutenant in the Houston Police Department discriminated against African-Americans and Hispanie-Americans between August 29, 1991 and March 26,1992.[1] Efforts to obtain redress for the Police Department’s allegedly discriminatory tests began in 1975 and 1976, when Kelley v. Hofheinz, C.A. No. H-75-1536, and Comeaux v. City of Houston, C.A. No. 76-H-1754, were filed.
Among other claims, the Kelley and Co-meaux eases raised the claim that the promotional examinations of the Houston Police Department discriminated against African-American police officers based on their race in violation of Title VII. These challenges to the promotional tests were based upon 1975 and 1976 EEOC charges of racial discrimination in the promotional tests. In 1979, the Comeaux action was consolidated into Kelley. In 1983, there were unsuccessful settlement discussions between the Kelley plaintiffs and the City of Houston.
On April 16, 1992, the City of Houston refused to consent to the intervention in Kelley of the Afro-American Police Officers League, the Houston Police Organization of Spanish Speaking Officers, and a group of African-American and Hispanic-American police officers. On April 17, 1992 the above groups moved for leave to intervene in Kelley, alleging that they had been harmed by racially discriminatory promotional examinations for the ranks of Sergeant and Lieutenant in the Houston Police Department, that the disposition of Kelley could impair their interests, and that in light of the passage of time, their interests were not being represented effectively in Kelley. On the same day, the City of Houston moved to dismiss Kelley for want of prosecution.
A hearing was held on June 15, 1992, on the City of Houston’s motion to dismiss Kelley, and on the motion for leave to intervene. The district court dismissed all claims in Kelley for want of prosecution except for test-promotion related claims after January 1, 1982, the district court also denied the application for leave to intervene, ordered the applicants for intervention to file a new lawsuit to be transferred to the same court, directed that the remainder of Kelley be consolidated into the new lawsuit, and ordered that the new plaintiff class consist of blacks and hispanics. This case was timely filed on August 19, 1992, after receipt of Notices of Right to Sue issued by the Attorney General of the U.S. The remnant of the Kelley case was then consolidated into this action.
The plaintiffs in this action alleged that the challenged examinations had the effect of disproportionately excluding African-Americans and Hispanie-Americans from promotion to Sergeant from 1982 to date, and of disproportionately excluding African-Americans from promotion to Lieutenant from 1982 to date. They further alleged that the examinations were not job-related or consistent with business necessity. The plaintiffs sued on their own behalf, on behalf of the African-American and Hispanic-American members of the Police Department who' took a Sergeant examination from 1982 to date or who will compete for promotions to Sergeant in the future.
Settlement negotiations began in earnest between the plaintiffs and defendant City of Houston in the fall of 1992. The settlement negotiations resulted in a proposed Consent Decree which was submitted to the district court in final form on January 21, 1993. On February 3, 1993, the district court ordered that notice be given to all current and former Class A Peace Officers of the City of Houston whose rights and interests were affected by the Consent Decree tentatively approved by it on that date. The notice stated that a free copy of the Consent Decree could be *1102 acquired from the Legal Services Division of the Houston Police Department. The notice also stated that March 12, 1993 was the deadline for filing objections, and that a fairness hearing was scheduled for March 24, 1993.
Before the fairness hearing was conducted, representatives of the following groups moved to intervene in the main case: Houston Police Patrolmen’s Union[2] (“HPPU”); the original named plaintiffs in the Comeaux action (McLoy Medlock, et al.); Houston Police Officers Association[3]; Female Police Officers; Asian Police Officers; and Houston Parks Police Officers.
On March 17, 1993, the district court signed an order informing the parties that a hearing on the motions for intervention was scheduled for March 22, 1993. At the hearing, the Houston Airport Police Officers Association [4] made an oral motion to intervene. It later filed a written motion on March 23, 1993. After the hearing, the district court denied all of the motions for intervention, including the Airport Police Officers oral motion.
On March 24, 1993, the district court held the fairness hearing. At the fairness hearing, the applicants for intervention were allowed to: (1) cross-examine witnesses, including the plaintiffs’ statistical experts and the Chief of Police; (2) proffer evidence; and (3) raise any objections to the Consent Decree. The district court again denied the motions for intervention, but allowed the applicants for intervention to file motions to intervene for purposes of appeal.
On March 25,1993, the district court certified the following class:
a. All African-Americans who are employed, or at any time since January 1, 1982 were employed, as Class A peace officers by the Houston Police Department and who took a promotional examination for the rank of Lieutenant or for the rank of Sergeant which was administered at any time from January 1, 1982 to the present, and those who will compete for such promotions in the future; and
b. All Hispanic-Americans who are employed, or at any time since January 1, 1982 were employed, as Class A peace officers by the Houston Police Department and who took a promotional examination for the rank of Sergeant which was administered at any time from January 1, 1982 to the present, and those who will compete for such promotions in the future.
On March 25,1993, the district court made one modification to the Consent Decree and made the Consent Decree a final judgment.[5] Under the terms of the Consent Decree, African-Americans and Hispanic-Americans who took an examination for Sergeant from January 1, 1982 to date, and who passed at least one examination for this rank, will receive a total of 96 remedial promotions; African-Americans and Hispanic-Americans who took an examination for Sergeant from January 1, 1982 to date, and who were promoted after a discriminatorily long waiting period which delayed their ability to compete for Lieutenant promotions will receive five remedial promotions to Lieutenant; and African-Americans who took an examination for Lieutenant from January 1, 1982 to date, and passed at least one examination for this rank will receive a total of five remedial pro *1103 motions. The named plaintiffs in this lawsuit who meet the necessary conditions shall have priority. The remedial promotions will be made over a five-year period. The district court saw this as a concession of great magnitude by the plaintiffs. The Consent Decree does not provide for any back pay.
The Consent Decree seeks, during the next ten years, to reduce the amount of adverse impact against African-Americans and Hispanic-Americans taking exams for Sergeant and Lieutenant: (a) by striking “racially biased items”; and (b) by extending the life of promotional registers during this period of time to two years.
The Consent Decree supersedes some provisions of the Fire and Police Civil Service Act and the Texas Local Government Code chapter 143, as amended. Paragraph 55 provides a mechanism for striking from the test those items which the City identifies as biased items and which are not job-related. Paragraph 55(g) provides that the promotional registers of test passers remain in effect for two years rather than one. Finally, the need to perform statistical analysis of responses and to examine test items for bias necessitates a short postponement of release of the test results. Paragraph 55(f) requires that an eligibility list for promotions be posted as soon as possible.
On May 20, 1993 the district court denied motions to intervene for purposes of appeal by the following groups: Houston Police Patrolman’s Union; Houston Airport Police Officers Association; Female Police Officers; Houston Police Officers Association; and the original named plaintiffs in the Comeaux action (McLoy Medlock, et al.).
The HPPU appellants and the Houston Airport Police Officers Association appeal the district court’s denial of their motions to intervene in the underlying case. The HPPU appellants, the Houston Airport Police Officers Association, the Houston Police Officers Association, and the original named plaintiffs in the Comeaux action appeal the district court’s denial of their motions to intervene for purposes of appeal. The HPPU appellants and the original named plaintiffs in the Comeaux action also appeal the district court’s approval of the Consent Decree. Finally, the Houston Airport Police Officers Association appeals the district court’s approval of paragraph 61 of the Consent Decree, entitled “Reclassification of Peace Officers.”[6]
II. DISCUSSION
1. Did the district court improperly deny the appellants’ motions to intervene in the underlying case?
The HPPU appellants and the Houston Airport Police Officers Association appeal the district court’s denial of their motions to intervene in the underlying case. They claim that the district court improperly denied their motions to intervene. They claimed the right to intervene pursuant to Federal Rule of Civil Procedure 24(a)[7] in part based upon the Civil Rights Act of 1991 provision which prohibits subsequent attacks on a Consent Decree entered in a Title VII proceeding, through separate litigation unless the objections and complaints are raised in the original proceeding. (42 U.S.C. § 2000e-2(n)(l)(B)). They allege that by refusing to permit intervention, the district court substantially limited their ability to challenge the Consent Decree. They claim that they met all the requirements for intervention of right.
The HPPU appellants assert that the principal ground relied upon by the district court for denying their motion was timeliness. They claim that their motion for intervention *1104 meets this court’s test for timeliness set out in Corley v. Jackson Police Dept., 755 F.2d 1207, 1209 (5th Cir.1985) (citing Stallworth v. Monsanto Co., 558 F.2d 257, 263 (5th Cir.1977)). They first argue that they met the district court’s deadline by filing their motion on March 12,1993. They further argue that their motion was filed just 37 days after the district court published notice of the terms of the Consent Decree and less than six months after the City of Houston filed its answer denying all of the plaintiffs allegations. They also argue that although rumors of a proposed consent decree began to circulate in late December 1992, they were not able to obtain, despite repeated efforts, any specific information regarding the Consent Decree until the February 3, 1993 notice was published. They claim that it was the appellees’ own conduct, in refusing to disclose the terms of the decree sooner, that caused any delay. Finally, they argue that the appellees can hardly show prejudice from any delay, since the appellees were required to give notice of the decree so that objections could be filed.
The Airport Police Officers Association (“Airport Police”) also claims that its application to intervene was timely. The Airport Police argue that they sought to intervene within a few weeks after obtaining a copy of the proposed Consent Decree. The Airport Police further argue that it is undisputed that they had no possible way of knowing prior to obtaining a copy of the proposed Consent Decree that it would contain a provision, such as paragraph 61, singling them out and seemingly intended to deny them the very transfer rights they won after lengthy litigation with the City of Houston.
The Airport Police also claim that they meet the test for timeliness set out in Corley v. Jackson Police Dept., supra. The Airport Police argue that the amount of time during which they could have known of their interest in the case before seeking to intervene was minimal. The Airport Police further argue that the appellees have not shown prejudice from any delay. Finally, the Airport Police argue that their prejudice from denial of intervention is substantial.
The HPPU appellants and the Airport Police alternatively sought permissive intervention under Federal Rule of Civil Procedure 24(b).
Denial of intervention of right is a question of law which we review de novo. Ceres Gulf v. Cooper, 957 F.2d 1199, 1202 (5th Cir.1992). Denial of permissive intervention is reviewed for clear abuse of discretion. Korioth v. Briscoe, 523 F.2d 1271, 1278 (5th Cir.1975).
At the hearing on the applications for intervention in the underlying case, the district judge stated that the appellants, “were entitled to ask to intervene earlier.” He also stated that the appellants could not have more time, and that he was “not going to delay this [process].” Finally, the district judge stated, “I don’t need an additional party’s litigant at the last moment. Your clients have a copy — or had available to them a copy of the Police Chiefs December 16th memorandum[8] on the potential settlement.” *1105 Based on these statements, we conclude that the district court denied the applications for intervention in the underlying ease on the basis of untimeliness.
“Whether leave to intervene is sought under section (a) or (b) of Rule 24, the application must be timely.” Stallworth v. Monsanto Co., 558 F.2d 257, 263 (5th Cir.1977).
“Timeliness,” ... is not a word of exactitude or of precisely measurable dimensions. Rule 24 fails to define it, and the Advisory Committee Note furnishes no clarification. As a result, the question of whether an application for intervention is timely is largely committed to the discretion of the district court, and its determination will not be overturned on appeal unless an abuse of discretion is shown.
Id. (citing NAACP v. New York, 413 U.S. 345, 367, 93 S.Ct. 2591, 2603-04, 37 L.Ed.2d 648 (1973)).
In Stallworth, we developed four factors to be considered in determining whether a motion to intervene was timely:
Factor 1. The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene....
Factor 2. The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor’s failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case....
Factor 3. The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied. ...
Factor 4. The existence of unusual circumstances militating either for or against a determination that the application is timely....
Id. at 264-66. “Stallworth is not an algorithm, but a framework for analysis.” Corley v. Jackson Police Dept., 755 F.2d 1207, 1209 (5th Cir.1985) (quoting Lelsz v. Kavanagh, 710 F.2d 1040, 1043 (5th Cir.1983)).
As the appellees point out, Chief of Police Nuehia met with the presidents of the Houston Police Officers Association and the Houston Police Patrolmans Union on November 4, 1992. At these meetings, Chief of Police Nuehia informed the representatives of those two groups that the City of Houston was undergoing settlement discussions with the plaintiffs. Moreover, on December 16, 1992, Chief of Police Nuehia issued a departmental circular to all police officers informing .them of the potential settlement in this lawsuit.
Factor 1. The appellants erroneously contend that we should consider February 3, 1993, the date the district court sent out formal notice, as the date from which to consider timeliness. As Stallworth makes clear, timeliness is measured from the point in time at which the applicant for intervention actually knew or reasonably should have known of his interest in this case. Based on the fact that Chief of Police Nuehia notified the appellants not only personally, but through the form of a departmental circular, there is no question that the appellants actually knew or should have known of their interest in this case in November or December of 1992. Therefore, the appellants waited three and a half to four and a half months before applying for intervention. Standing alone, this would probably not merit a finding of untimeliness, however, it certainly does not bode in the appellants’ favor.
Factor 2. The second factor relates to the prejudice to the existing parties if the appel- *1106 ’ intervention is allowed. In this case, what is of particular importance is not so much the length of the appellants’ delay in filing for intervention, as what occurred during the period of that delay. During this period of delay, the proposed Consent Decree was put into final conceptual form. The interests of the City of Houston, of both groups in the plaintiff class, and of other employees were considered and meshed to the greatest extent possible; the number of remedial promotions was negotiated; and the seniority complications caused by the plaintiffs’ concessions to the City of Houston and to non-class-members in stretching out the remedial promotions over five years were worked out. Therefore, as in Corley v. Jackson Police Dept., 755 F.2d 1207, 1210 (5th Cir.1985), the prejudice is apparent. “A negotiated settlement of a difficult problem is put at risk, to the disadvantage of the named parties, the class, the police department and the City.” Id.
Factor S. The third factor contemplates the extent of prejudice the applicant for intervention would suffer if his motion for intervention is denied. In this case, there is no prejudice to the appellants. At the fairness hearing, the appellants were allowed to present testimony and argument on their written objections to the Consent Decree. The appellants were also allowed to cross-examine Chief of Police Nuchia and the plaintiffs’ statistical experts. The district court considered all of the appellants’ objections to the Consent Decree. The district court, in the Findings of Fact and Conclusions of Law, answered each of the appellants’ objections and stated why it was not persuaded by their arguments. In essence, the appellants were treated as if they were parties to the lawsuit. Thus, the appellants have already been afforded the substance of the benefits of intervention as to all their objections. The appellants have had their day in court.
Factor A There are no unusual circumstances militating either for or against a determination that the appellants’ applications were timely.
From the perspective of the Stallworth analysis, we find that the district court did not abuse its discretion in rejecting the appellants’ applications for intervention. Therefore, the appeals on the denial of intervention in the underlying case are dismissed.
2. Did the district court err in denying the appellants’ applications to intervene for purposes of appeal?
All of the appellants claim that the district court erred in denying their motions to intervene for purposes of appeal. The appellants claim that they meet all of the requirements to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a). They claim that this court established four requirements which must be met to demonstrate a right to intervene: (1) the application to intervene must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede, his ability to protect that interest; and (4) the applicant’s interest must be inadequately represented by existing parties. New Orleans Public Service v. United Gas Pipe Line Co., 732 F.2d 452, 463 (5th Cir.) (en bane), cert. denied sub nom., Mortal v. United Gas Pipe Line Co., 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).
The appellants all claim that their motions to intervene for purposes of appeal were timely filed. They argue that their motions were filed by the district court’s April 19, 1993 deadline.
The HPPU appellants also claim that the district court, by refusing to permit intervention, substantially limited the HPPU appellants’ ability to challenge the Consent Decree. They argue that because the terms of the Consent Decree authorize the City of Houston to continue to impermissibly discriminate against them, and because the Consent Decree will remain in effect for ten years under the district court’s jurisdiction, the district court’s refusal to allow intervention has effectively denied them their right to participate in this and future proceedings affecting their promotional opportunities.
The Airport Police argue, with regard to the second factor of the New Orleans Public *1107 Service test, that if the City of Houston complies with paragraph 61 of the Consent Decree, they will be confined to the airport and will be unable to transfer elsewhere in the City for the next ten years of their careers. The Airport Police argue that their career paths and promotional opportunities will be sharply curtailed. The Airport Police conclude, therefore, that their interest in this transaction is “legally protectable.”
The Airport Police further argue that if the City complies with paragraph 61, the City will violate the state court decree which directs the City to afford each Airport Officer the same transfer rights as are afforded to Officers of corresponding rank in the Patrol Divisions of the Houston Police Department.
The original plaintiffs in the Comeaux action argue, in reference to the third factor, that the Consent Decree impairs or impedes their ability to protect their interests. They argue that their claims for years prior to 1982 were literally wiped out. They concede that these claims were dismissed in 1992. However, they claim that this was in error and that they should have been afforded relief in the Consent Decree. With regard to the fourth factor, they claim that the plaintiffs had a clear interest in dismissing the pre-1982 claims, and that the City had an interest in dismissing those claims to avoid complying with any benefits or back pay awards.
The Houston Police Officers Association argues with regard to the fourth factor, that their interests in the underlying case were not the same and to a large extent, diametrically opposite from those of the plaintiffs and defendant City of Houston. Specifically, the Consent Decree was the end result of settlement negotiations between the plaintiffs and the City only. The interests of the Houston Police Officers Association was in no way factored into the settlement agreement. The Association further argues that the remedial promotions will cause persons with lower scores to be promoted over individuals who performed better on the promotional exams.
All of the appellants alternatively sought permissive intervention under Federal Rule of Civil Procedure 24(b). The appellants argue that since their claims all arose out of the proposed Consent Decree, there were common questions of law and fact.
As stated earlier, denial of intervention of right is a question of law which we review de novo. Ceres Gulf v. Cooper, 957 F.2d at 1202. In order to determine whether a party has demonstrated a right to intervene, we examine the four requirements set out in New Orleans Public Service, 732 F.2d at 463.
First, all of the appellants’ motions to intervene were timely filed. The appellants filed their motions before the district court’s deadline on filing the motions to intervene for purposes of appeal.
With regard to the' second requirement, the critical question is what type of interest the appellants have in the promotional system. To demonstrate an interest in the transaction sufficient to support intervention as of right, an applicant “must demonstrate a ‘direct, substantial and legally protectable’ interest in the property or transaction that is the subject of the suit.” League of United Latin American Citizens v. Clements, 884 F.2d 185, 187 (5th Cir.1989) (quoting New Orleans Public Service, 732 F.2d at 463). The appellants’ interest is in making sure that the promotional system is not manipulated in such a manner, that it discriminates against them. This interest is sufficient to support intervention as of right.
To meet the third requirement, the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede, his ability to protect that interest. New Orleans Public Service, 732 F.2d at 463. Although, the appellants were treated as if they were parties in the underlying action, the district court did not allow the appellants to benefit from appellate review of the Consent Decree. The appellants were able to protect their interests below because they were able to bring forth all of their objections and arguments. However, part of the ability to protect their interests is the ability to subjugate the district court’s disposition of their ease to appellate scrutiny. We stated earlier that the appellants have had their day in court. Concomitant with having one’s day in court is appellate review of that day.
*1108 The fourth requirement inquires whether the applicant for intervention’s interest is adequately represented by existing parties. Id. The appellants’ interests were adequately protected in the district court because they were given the opportunity to represent their own interests. However, when the district court denied their applications for intervention for purposes of appeal, none of the existing parties adequately represented the appellants’ interests. This is evidenced by the fact that neither the City of Houston nor the plaintiffs sought appellate review of the Consent Decree. Those two parties were content with their settlement, while the appellants obviously were not.
We find that the appellants meet all of the requirements to intervene as of right for purposes of appeal. Thus, it is unnecessary to determine whether the district court abused its discretion in denying permissive intervention.
We, therefore, reverse the district court’s denial of the appellants’ motions to intervene for purposes of appeal.
Having found that the district court erred in this manner, we now turn to the appellants’ substantive arguments.
3. Did the district court err in approving the Consent Decree?
The HPPU appellants argue that this circuit requires a district court to become more involved in the settlement process when it is called upon to approve a Title VII consent decree. They argue that the district court failed to review the terms of the Consent Decree and the evidence in support of it with sufficient scrutiny. They also argue that the Eleventh Circuit has held that the operative law for judging a consent decree is the same as that for voluntary affirmative acts. In re Birmingham Reverse Discrimination Employment Litigation, 833 F.2d 1492, 1501 (11th Cir.1987). They further argue that the district court should have used a strict scrutiny standard because the Consent Decree on its face provides for both “racial quotas” and future racial classifications. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). Finally, they argue that the district court’s failure to take into account the special deference allowed to police departments in determining “job related” testing, constituted an abuse of its discretion. See Davis v. City of Dallas, 777 F.2d 205, 211 (5th Cir.1985), cert. denied, 476 U.S. 1116, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986).
The HPPU appellants also argue that in a case in which the Fourteenth Amendment is properly invoked, race conscious relief may only be employed to remedy identifiable past discrimination, and relief may only be granted to the victims of that discrimination.
[F]or the governmental interest in remedying past discrimination to be triggered “judicial, legislative, or administrative findings of constitutional or statutory violations” must be made. Only then does the government have a compelling interest in favoring one race over another.
Richmond v. Croson, 488 U.S. at 497, 109 S.Ct. at 723 (quoting California Regents v. Bakke 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978)). Furthermore, the governmental entity must have a “strong basis in evidence for its conclusion that remedial action was necessary.” Id. at 500, 109 S.Ct. at 725 (quoting Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277, 106 S.Ct. 1842, 1848-49, 90 L.Ed.2d 260 (1986)).
The HPPU appellants’ argue that the district court failed to require such a strong basis in the evidence. The only evidence of past discrimination is the questionable statistical analysis performed by plaintiffs’ counsel. They also contend that there was no attempt by the district court to determine whether the promotional exams measured performance of skills necessary for the jobs of Sergeant and Lieutenant of police within the Houston Police Department. They further contend that the City did not make any attempt to validate the contents of the exams.
The HPPU appellants argue that the law draws a distinction between relief that is intended to remedy the effect of past discrimination and relief which is designed to compensate an individual who has been the specific victim of past discrimination. See Firefighters Local Union No. 1784 v. Stotts, *1109 467 U.S. 561, 578-79, 104 S.Ct. 2576, 2587-88, 81 L.Ed.2d 483 (1983). They contend that in the instant case there was no evidence to support any finding that any of the individuals who would be receiving the 106 remedial promotions were the actual victims of any discrimination. They further contend that the Consent Decree establishes an unconstitutional pool of positions available for the promotions of individuals within the Houston Police Department based solely upon then-race. See generally Bakke; Wygant; Firefighters.
The HPPU appellants also contend that the Consent Decree fails to narrowly tailor the prospective relief provided to the disparity shown and unnecessarily trammels the interests of non-Black, non-Hispanic officers within the Police Department in a way that violates the standards applicable to even nonpublic employers. See United Steel Workers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).
The HPPU appellants further contend that the Consent Decree was collusive and/or fraudulent and/or transparently invalid. They also contend that the Consent Decree contains several provisions which violate Title VII. For example, the Consent Decree divests them of vested promotional and seniority rights under a valid merit based promotional testing procedure. Paragraph 55 of the Consent Decree authorizes the Police Department to adjust future promotional test scores on the basis of race. The Consent Decree further provides for readjustment to scores in the event the “log linear” analysis results in failing an officer who otherwise passed the exam.
Finally, the HPPU appellants argue that the district court’s refusal to allow them, and others, to present the testimony they had prepared to demonstrate the questionable validity of the Consent Decree, deprived them of a fair and equal opportunity to protect their rights under the law. Thus, their equal protection and due process rights were impaired.
The Airport Police Officers claim that the district court erred in approving paragraph 61 of the Consent Decree. They contend that the legitimate purposes of the Consent Decree are to cure the ethnic bias of the promotional exams and to improve the racial mix of the Sergeant and Lieutenant ranks of the Police Department. Paragraph 61 purports to further these goals by totally excluding them from even taking the tests. They argue that excluding them from taking the tests will not make the tests less biased. Likewise, their exclusion has no relationship to improving the racial mix of the Sergeant and Lieutenant ranks.
The original Comeaux plaintiffs argue that the Consent Decree is woefully unjust, unfair, unreasonable and inadequate. Under the Consent Decree some of the class members do not receive relief, including monetary relief; the relief for the appellee-plaintiffs is significantly greater than their relief; and some members of the certified class are treated differently than other class members. They also argue that the wrongful dismissal of their claims precluded them from being included in the negotiations leading to the Consent Decree. They further argue that even where there is a clear record of delay, the sanction of dismissal is justified only where a lesser sanction would not suffice.
Under the terms of the Consent Decree, African-Americans and Hispanie-Americans who took an examination for Sergeant from January 1, 1982 to date, and who passed at least one examination for this rank, will receive a total of 96 remedial promotions. Since African-Americans suffered 64.6% of the shortfall in Sergeant promotions, they will receive 64.6% of the remedial promotions to Sergeant, for a total of 62 remedial promotions to Sergeant. Hispanie-Americans suffered 35.4% of the shortfall in Sergeant promotions, hence, they will receive 35.4% of the remedial promotions to Sergeant, for a total of 34 for remedial promotions to Sergeant. African-Americans and Hispanie-Americans who took an examination for Sergeant from January 1,1982 to date, and who were promoted after a discriminatorily long waiting period which delayed their ability to compete for Lieutenant promotions will receive five remedial promotions to Lieutenant. African-Americans will receive three of those promotions and Hispanie-Americans will receive two of those promotions. Finally, Afri *1110 can-Americans who took an examination for Lieutenant from January 1,1982 to date, and who passed at least one examination for this rank will receive a total of five remedial promotions.
The Consent Decree seeks, during the next ten years, to reduce the amount of adverse impact against black and hispanic police officers taking the promotional exams by: (a) striking items biased against any race; and (b) extending the life of the promotional registers during this period to two years.
The appellants attack the Consent Decree’s validity under Title VII and the Equal Protection Clause of the Fourteenth Amendment. Although the obligations of a public employer under Title VII are similar to its obligations under the Federal Constitution, they are not the same.[9] We, therefore, examine each of the appellants’ arguments in turn.

Validity under Title VII

“In Title VII litigation, this Court had held that the district court is entitled to a substantial measure of discretion in dealing with consent decrees, and that as a result ‘on appeal, our duty is to ascertain whether or not the trial judge clearly abused his discretion_’” Williams v. City of New Orleans, 729 F.2d 1554, 1558 (5th Cir.1984) (en banc) (quoting Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir.1977)).
As a preliminary matter, we note that petitioner bears the burden of establishing the invalidity of the [Consent Decree].... Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer’s employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer’s decision, the burden shifts to the plaintiff to prove that the employer’s justification is pretextual and the plan is invalid. As a practical matter, of course, an employer will generally seek to avoid a charge of pretext by presenting evidence in support of its plan. That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.
Johnson v. Transportation Agency, 480 U.S. 616, 626-27, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987).
There is no doubt that the Consent Decree’s remedial promotions take race into account. Thus, the appellants have made their prima facie case. We now turn to the validity of the Consent Decree.
The Supreme Court in Johnson articulated a two-prong test for determining whether a race-conscious affirmative action plan comports with Title VII. “The first issue ... is whether the consideration of sex [or race][10] *1111 of applicants ... was justified by the existence of a ‘manifest imbalance’ that reflected underrepresentation of women [or minorities] in ‘traditionally segregated job categories.’ ” Id. at 631,107 S.Ct. at 1451-52 (citing Weber, 443 U.S. at 197, 99 S.Ct. at 2724). “We next consider whether the Agency Plan [race-conscious plan] unnecessarily trammeled the rights of male [or nonminority] employees or created an absolute bar to their advancement.” Id. at 637-38, 107 S.Ct. at 1455.
A.
In determining whether an imbalance exists that would justify taking race into account, a comparison of the percentage of minorities in the employer’s workforce with the percentage in the appropriate labor market is required. See Id. at 631-32, 107 S.Ct. at 1451-52 (citing Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Where a job requires training, the comparison should be with those minorities in the labor force who possess the relevant qualifications. Id. (citing Hazlewood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)). The manifest imbalance requirement is not the same as a prima facie case against an employer. “A manifest imbalance need not be such that it would support a prima facie ease against the employer, as suggested in Justice O’Connor’s concurrence, post, [480 U.S.] at 649 [107 S.Ct. at 1461], since we do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans.” Id. at 632, 107 S.Ct. at 1452; see also, Id. at 632 n. 10, 107 S.Ct. at 1453 n. 10 (explaining the difference between “manifest imbalance” and “prima facie”).
The plaintiffs’ evidence contained statistical analysis on each of the Sergeant and Lieutenant examinations from 1982 to 1991. The plaintiffs provided the district court with statistical evidence on the number of total test takers for each exam, the number of test takers by racial or cultural classification, the total number of those promoted, the number of those promoted by classification, the percentage of those promoted by classification, the promotion rates of blacks and hispanics as a percentage of whites promoted, the number of expected promotions for blacks and hispanics, the difference between actual and expected promotions for blacks and his-panics, the number of standard deviations between expected and actual promotions, and racial disparities in mean and median written scores. The District Court found that no objector presented any credible evidence that any factor other than the challenged tests, accounted for any meaningful part of the racial disparities in the promotion rates between the different racial groups.
The relevant labor market that was used in this case was the number of minority police officers who took the promotional examinations. Undoubtedly, a comparison was made to the appropriate labor market.[11] We find that the plaintiffs established a manifest imbalance in promotion rates for black and hispanic officers, and that they brought this to the City of Houston’s attention.
B.
Having found that the Consent Decree meets the first requirement of the Johnson analysis, we now examine whether the Consent Decree unnecessarily trammels the rights of nonminorities or creates an absolute bar to their advancement.
In this case, the Consent Decree does not provide any remedy for blacks or hispanics who failed the promotional tests at issue. Minorities who fail the promotional tests are not eligible for remedial promotions. See Johnson 480 U.S. at 636, 107 S.Ct. at 1454 (if plan fails to take distinctions in qualifications into account, it would dictate mere blind hiring by numbers). Furthermore, the remedial promotions are being granted on a onetime-only basis. The Consent Decree does *1112 not call for any remedial promotions after the five-year phase in period. With regard to the elimination of future test questions which are racially biased, questions biased against any race will be eliminated. This will provide benefits to minority and nonminority police officers. The elimination of racially biased questions will occur only over a ten-year period. After that period of time, the City will no longer face this constraint. Likewise, the extension of promotional lists from one to two years increases the possibility of promotion for all police officers.
The Consent Decree does not require the discharge of nonminority officers and their replacement with new minority officers. See United Steelworkers of America v. Weber, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979). Furthermore, the Consent Decree does not create an absolute bar to the advancement of nonminority officers. Id. Although nonminority officers may not be promoted at exactly the same rate and numbers as before, they will continue to be promoted in substantial excess of their representation among test takers. Finally, the Consent Decree in this case is a temporary measure. It is not intended to maintain any specific racial balance, rather it attempts to alleviate a manifest racial imbalance.
Therefore, the Consent Decree does not unnecessarily trammel on the interests of nonminorities, nor create an absolute bar to their advancement.
Since the Consent Decree is justified by a manifest imbalance that reflected the under-representation of minority police officers in the Sergeant and Lieutenant ranks, and the Consent Decree does not unnecessarily trammel on the rights of nonminority officers, we conclude that the district court did not abuse its discretion in approving the Consent Decree under Title VII.

Validity under the Equal Protection Clause

Having found that the Consent Decree is valid under Title VII, we now examine its validity under the Equal Protection Clause of the Fourteenth Amendment.[12]
“A district court evaluating a proposed Title VII consent decree must determine whether the decree will have an unreasonable or unlawful impact on third parties if approved.” Black Fire Fighters Ass’n v. City of Dallas, 19 F.3d 992, 996 (citing Williams v. City of New Orleans, 729 F.2d 1554, 1559-60 (5th Cir.1984) (en banc)). Voluntary affirmative-action plans memorialized in a consent decree are considered equivalent to voluntarily adopted affirmative-action plans for purposes of equal protection analysis. Howard v. McLucas, 871 F.2d 1000, 1006 (11th Cir.1989), cert. denied sub nom., Poss v. Howard, 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989); In re Birmingham Reverse Discrimination Employment Litigation, 833 F.2d 1492, 1501 (11th Cir.1987). Race-conscious remedial measures receive strict scrutiny under the Equal Protection Clause. Black Fire Fighters Ass’n, 19 F.3d at 995 (citing City of Richmond v. J.A. Croson Co., 488 U.S. 469, 492-97, 109 S.Ct. 706, 721-23, 102 L.Ed.2d 854 (1989) (4-Justice plurality); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (4-Justice plurality). “There are two prongs to this examination. First, any racial classification ‘must be justified by a compelling governmental interest.’ Second, the means chosen by the State to effectuate its purpose must be ‘narrowly tailored to the achievement of that goal.” Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (internal citations omitted).
The Supreme Court has “insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination.” Id. (citing Hazlewood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)).
Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is chal *1113 lenged in court by nonminority employees .... In such a case, the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary. The ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative-action program. But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination.
Id. at 277-78, 106 S.Ct. at 1849.
In this ease the district court specifically found that:
Plaintiffs have proven the disparate impact of the challenged examinations. Their expert testimony and other evidence created substantial doubt as to the job-relatedness of the challenged tests. It is not necessary for the Court to resolve the question whether the challenged examinations were job-related. Plaintiffs have shown a sufficiently firm basis for the relief provided in the proposed Consent Decree.
As stated in the section discussing the validity of the Consent Decree in Title VII, the plaintiffs provided detailed statistics on the promotion rates of nonminorities, blacks and hispanics. The plaintiffs also identified numerous questions on the examinations which they alleged were extremely difficult to defend as job-related and consistent with business necessity. Clearly, the district court had ample evidence from which to conclude that the plaintiffs had proven disparate impact and that the City of Houston had justifiably concluded that it would be difficult to defend the job-relatedness of the questions on the promotional exams. More importantly, the City of Houston had a strong basis in evidence to conclude that remedial action was necessary.
Having found that the Consent Decree’s racial classifications are justified by a compelling governmental interest, namely remedying prior discrimination, we must now decide whether the Consent Decree is narrowly tailored to the achievement of that goal.
The Supreme Court has focused on several factors in analyzing race-conscious remedial measures: the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties. United States v. Paradise, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (4r-Justice plurality).

Necessity for particular relief

In order to evaluate the district court’s determination that the remedial promotions, the elimination of racially biased test questions on future exams, and the extension of the promotional lists from one to two years, were necessary, we must examine the purposes the relief was intended to serve. Id. The Consent Decree was entered into in this case to remedy past discrimination and to alleviate the adverse impact of the promotional exams in the future. The remedial promotions are only directed to those positions where the discrimination occurred. Moreover, those promotions are only for those who most likely suffered discrimination and in direct proportion to the amount of discrimination they suffered. As the district court pointed out, Asians and women were not allowed to become part of the plaintiff class because they could not show that they were discriminated against in the promotional exams.

The Flexibility and Duration of the Relief

To determine whether the Consent Decree meets the narrow tailoring requirement, consideration of the flexibility and duration of its proposed relief, must be undertaken.
The Consent Decree proposes remedial promotions which will be stretched over a five year period, the elimination of questions biased against any race over a ten year period, and the extension of promotional lists from one to two years. The relief which the Consent Decree proposes does not continue indefinitely. Rather, it is of a temporary nature. The district court found that the plaintiffs’ agreement to have the remedial *1114 promotions phased in over five years was a concession of great magnitude. The remedial promotions will be phased in over a great period of time solely to make sure that the disruption within the police department is minimized. The fact that racially biased questions will be eliminated from exams for ten years does not mar the Consent Decree, because questions biased against all races will be eliminated. Thus, all police officers will benefit. Likewise, the extension of the promotional lists to two years will help the promotional opportunities of all police officers.
With regard to flexibility, the Consent Decree does not impose rigid quotas against the police department. The Consent Decree requires only the remedial promotion of qualified blacks and hispanies. Only members of the plaintiff class who have passed the appropriate promotional exam are eligible for promotion. See United States v. Paradise, 480 U.S. 149, 177, 107 S.Ct. 1053, 1069, 94 L.Ed.2d 203 (1987) (fact that requirement to promote blacks on a one for one ratio with whites could be waived if no qualified black candidates were available, weighed in favor of the flexibility of an affirmative action plan under equal protection analysis). Hence, the police department is never required to promote an unqualified minority in preference of a qualified nonminority.
More importantly, the Consent Decree is not designed to maintain any particular racial balance. The police department is not required to increase the number of minority promotions simply because it happens to promote more nonminorities in the future.

Numerical Goals

Another method of determining whether the proposed relief is narrowly tailored, is to examine the relationship of the numerical goals to the relevant labor market. This is one of the strengths of the Consent Decree. The number of remedial promotions exactly matches the number of promotions lost by black and hispanic police officers. For example, on the September 23, 1982 Sergeant examination, the statistical analysis showed that hispanies did not suffer any adverse impact. Consequently, the hispanies were not given any remedial promotions based on this exam.
As previously stated, the relevant labor market that was used in this case was the number of minority police officers who took the promotional examinations. Unlike, other race-conscious plans which have not passed constitutional muster because they inappropriately compare the number of minorities in a specific position, regardless of the level of skill required for that position, with the number of minorities in the general labor force, the Consent Decree makes its comparison solely with the number of minorities in the police department. Clearly, the number of minority police officers who took the exam is the relevant labor market.[13] Once the remedial promotions are made, the promotional relief ends, regardless of the percentage of blacks and hispanies in the Sergeant and Lieutenant ranks.

Impact upon Third Parties

The impact upon third parties is a major aspect of this Consent Decree. A state or local government may constitutionally require innocent nonminorities to share the burden of remedying the effects of past identified discrimination. See Fullilove v. Klutznick, 448 U.S. 448, 484, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980).
It is evidently clear that the impact upon the nonminorities is negligible. The Consent Decree does not impose an absolute bar to the promotion of nonminorities. See Paradise, 480 U.S. at 184, 107 S.Ct. at 1073. More importantly, all the remedial promotions will be to newly created positions by the City of Houston. In no way are the nonminorities hurt by this Consent Decree. The nonminorities will be able to compete for exactly the same number of promotions that would exist in the absence of the Consent Decree. Their expectations and promotional opportunities are left fully intact.
As the district court stated in its opinion on denial of intervention for appeal:
*1115 The remedial promotions will be to positions that the city would not have otherwise created, leaving the non-class officers the same number of promotions that they would have had in the absence of the decree. The movants could have claimed, but did not, that they should be allowed to compete as equals for every position the city creates whether it would have otherwise under current city policy. The city could not create an additional set of officer positions and gratuitously reserve them for blacks, women, or East Europeans. The positions created by the consent decree and the partial reservation are predicated on an established history of abuse, not on a claim to quotas or sensitivity to ethnicity in gross.
As to the. HPPU appellants’ fears that people who scored lower on the promotional exams will be promoted before their members with higher scores:
Their objections reflect confusion, at best. All of the examinations will be re-scored. The union members must compete fairly for promotions; they do not have a vested interest in continuing to receive the benefits of past discrimination.
The Airport police also cannot claim that the Consent Decree harms their ability to be considered Class A officers or to be merged with the Class A officers of the Houston Police Department. The District Court of Harris County, Texas has specifically ordered:
IT IS, THEREFORE, ORDERED ADJUDGED AND DECREED that members of the Houston Police Department Specialized Police Division, Park Police, of the City of Houston, Texas be denied entry into the uniformed and Detective Class, (Class “A”) of the Houston Police Department except by application, qualification, and entry at an entry level position.
Based on the factors outlined by the Supreme Court in Paradise, we find that the Consent Decree is narrowly tailored.
Therefore, we conclude that the Consent Decree is valid under the Equal Protection Clause of the Fourteenth Amendment;
C.
Finally, we must answer the appellants objections which did not fall under traditional Title VII or Equal Protection Clause analysis. The Consent Decree’s use of “log-linear” analysis to eliminate racially biased test items does not violate § 703(2) of the Civil Rights Act of 1964, as amended by § 106 of the Civil Rights Act of 1991. That section was intended to prevent the manipulation of test scores on valid employment-related tests. This provision is not applicable to the promotional tests at issue, because there is substantial doubt as to their job-relatedness.
In response to the Comeaux appellants’ objections, the district court found that it would be unreasonable to delay or cancel the proposed relief for persons who actively sought to press their rights, in favor of persons who did not press their rights. As the appellees point out, the Comeaux appellants have not proffered any evidence that the failure of prosecution was exclusively the fault of their counsel.
The district cpurt aptly stated that there can be little doubt that the federal courts have the power to enter an order overriding provisions of State or local law, where necessary, to provide an appropriate remedy in a settlement of a case in which the plaintiffs are alleging a violation of Federal law. However, the district court must take care that the provisions of State or local law are overridden only insofar as it is reasonable and appropriate to the remedy in question. United States v. City of Chicago, 549 F.2d 415, 437-38 (7th Cir.), cert. denied sub nom., Arado v. U.S., 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). We agree with the district court that the Consent Decree impinged as little as possible upon the provisions of State law.
We conclude that the Consent Decree is valid under Title VII, the Equal Protection Clause of the Fourteenth Amendment, and all of the appellants’ objections.
Therefore, we affirm the district court’s approval of the Consent Decree.
*1116 III. CONCLUSION
We find that the district court appropriately denied the appellants’ motions to intervene in the underlying case on the basis of untimeliness. Accordingly, we DISMISS those appeals. We REVERSE the district court’s denial of the appellants’ motions to intervene for purposes of appeal. Since we reach the appellants’ arguments as to the validity of the Consent Decree, and AFFIRM the district court’s approval of the Consent Decree, the district court’s denial of the motions for purposes of appeal is harmless error. Furthermore, since we have affirmed the district court in the entering of the Consent Decree and have held that the district court’s denial of the motions to intervene for purposes of appeal is harmless error, the court below is AFFIRMED in all respects.[14],[15]

. The entry-level uniformed position within the Houston Police Department is Police Officer. The first promotional position is currently the rank of Sergeant. Police Officers with two years of service as Police Officers are allowed to compete for the rank of Sergeant. The second promotional position is the rank of Lieutenant. Sergeants with two years of service as Sergeants are allowed to compete for the rank of Lieutenant.

. The HPPU appellants are comprised of 109 individual Class A Peace Officers who held the position of police officer on February 3, 1993, and 22 individual Class A Peace Officers who held the position of Sergeant on that date. The HPPU appellants sought to intervene as class representatives of all similarly situated Class A Peace Officers holding the rank of police officer, Sergeant, or Lieutenant.

. Doug Elder and Mark Clark, individually and as representatives of the Houston Police Officers Association, and all Class A Police Officers, holding the rank of Police Officer and Sergeant of Police.

. Terry Hughes, present and former Airport Police and Airport Police Officers Association.

. The district court added the following sentence after the first sentence of paragraph 34.
A person who receives a remedial promotion will receive compensatory retroactive seniority only back to the date six months after the earliest test that person took for the position, even if the promotion arises from a disparity in an earlier test.

. The Houston Parks Police Officers filed an ami-cus brief in support of the Airport Police Officers position.

. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant’s interest is adequately represented by existing parties. Federal Rule of Civil Procedure 24(a).

.
Circular
Houston Police Department
December 16, 1992 No. 92-1216-1
SUBJECT: POTENTIAL SETTLEMENT
The Department has agreed in principle to settle a long standing lawsuit regarding our promotional system. The details of this settlement are still being negotiated; however, I want to give as much correct information as I can now. A proposed version of the agreement will be filed in Federal Court on Tuesday, December 22, 1992. Shortly after that date, I should be able to give you detailed information. The following aspects are being negotiated and are likely to become part of the final settlement.
Settlement Summary
1. A number, yet to be determined, of minority police officers and sergeants will be promoted to sergeant and lieutenant. The promotions will be based on the lists established during the years 1982 through 1991.
*1105 2. Remedial promotions will be completed over a four to five year period.
3. A statistical analysis will be utilized on future promotional exams for sergeant and lieutenant to identify any racially biased questions. The questions identified as such will be thrown out after the tests.
4. Current and future sergeant and lieutenant promotional lists will remain in existence for two years.
5. The procedures agreed on will be monitored by the Federal Court for ten years.
6. All Class A officers will receive official notification of the Court's consent decree and will be an opportunity to address their concerns to the Court.
Sam Nuehia
Chief of Police

. Justice Scalia's dissent maintains that the obligations of a public employer under Title VII must be identical to its obligations under the Constitution, and that a public employer's adoption of an affirmative action plan therefore should be governed by Wygant.... "Title VII, by contrast, was enacted pursuant to the commerce power to regulate purely private decision making and was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments.” United Steelworkers of America v. Weber, 443 U.S. 193, 206 n. 6, 99 S.Ct. 2721, 2729 n. 6, 61 L.Ed.2d 480 (1979).
* * * H * T
The fact that a public employer must also satisfy the Constitution does not negate the fact that the statutory prohibition with which that employer must contend was not intended to extend as far as that of the Constitution.
Johnson v. Transportation Agency, 480 U.S. 616, 627 n. 6, 107 S.Ct. 1442; 1450 n. 6, 94 L.Ed.2d 615 (1987) (explaining why the Transportation Agency’s affirmative action plan should be analyzed under Weber (Supreme Court addressed the question whether the employer violated Title VII by adopting a voluntary affirmative action plan), rather than Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (Equal Protection analysis)).

. "Because of the employment decision at issue in this case, our decision henceforth refers primarily to the Plan’s provision to remedy the underrepresentation of women. Our analysis could apply as well, however, to the provisions of *1111 the plan pertaining to minorities.” Johnson, 480 U.S. at 635 n. 13, 107 S.Ct. at 1454 n. 13.

. Johnson states that where a job requires special training, the comparison should be with those in the labor force who possess the relevant qualifications. Johnson, 480 at 632, 107 S.Ct. at 1452. Therefore, we do not reach the issue of whether the number of minorities in the police force is the only relevant labor market.

. "Of course, where the issue is properly raised, public employers must justify the adoption and implementation of a voluntary affirmative action plan under the Equal Protection Clause." Johnson, 480 U.S. at 620, 107 S.Ct. at 1446 (1987) (citing Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)).

. Again, we do not reach the issue of whether the number of minorities who took the exam is the only relevant labor market.

. The dissent accused the author of "extrapolation" of the record to get to the finding that the district court denied the intervention on the ground of untimeliness. All one has to do is read the briefs of the appellants who tried to intervene and they all admitted that their intervention was denied on grounds of untimeliness and they argued as to why their motions to intervene were not untimely. If the dissent wants to be blind to what the appellants say on the issue, I have no control over that.

. I wish to thank my co-panelist Judge Parker for his concurring opinion and coming to the defense of the opinion which he says he agrees with. I specially thank him for discussing the question of jurisdiction which the dissent seems to think we did not have in this case.
I have never had any question in my mind about the court having jurisdiction. The appellant police organizations in this case, while not allowed to intervene, participated in the "fairness hearing" provided by the 1991 amendments to the Civil Rights Act as objectors to the Consent Decree. The statute that allowed them to appear as objectors made them parties and, after the "fairness hearing”, if they were not satisfied with what the court had done with the Consent Decree they had a perfect right to appeal. They did not have to ask permission from anyone. The statute made them parties. Appeal they did and we heard their objections to the Consent Decree, but affirmed the court below because the court had done the right thing in approving the Consent Decree entered into between the class and the City of Houston.