IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-1947

_____

BLACK FIRE FIGHTERS ASSOCIATION OF
DALLAS, ET AL.,

                                        Plaintiffs,

BLACK FIRE FIGHTERS ASSOCIATION OF
DALLAS, ET AL.,

                                        Plaintiffs-Appellants,

                        versus

CITY OF DALLAS, TEXAS,

                                        Defendant,

DALLAS FIRE FIGHTERS ASSOCIATION,

                                        Intervening Defendant-
                                        Appellee.


_____

Appeals from the United States District Court
for the Northern District of Texas
_____

(April 18, 1994)

Before HIGGINBOTHAM and DUHÉ, Circuit Judges, and LITTLE,[*] District
Judge.

HIGGINBOTHAM, Circuit Judge:

_____

[*]District Judge of the Western District of Louisiana,
sitting by designation.

This lawsuit challenges the promotion practices of the Dallas Fire Department as racially discriminatory. The district court rejected a proposed consent decree because a race-conscious remedy it contained could not withstand strict scrutiny. We affirm.

I.

The Black Fire Fighters' Association of Dallas sued the city on behalf of a class of black firefighters who sought but did not receive promotions[1] between September 17, 1986, and July 12, 1990. After the suit began, the city changed several features of its promotion process, including eliminating the rank of Second Driver, reducing time-in-grade promotion eligibility requirements, and ending the practice of adjusting test scores upward for seniority. It also used some "skip promotions" to promote blacks over nonblacks who scored higher on promotion exams.

After completing discovery, the city and the plaintiffs presented a proposed settlement agreement to the district court. It memorialized some of the adjustments the city had made to its promotion criteria, gave awards of back pay to class members, and instituted a new system of skip promotions. The department would

---

[1]According to the city's stipulations, when the suit began in 1986, the Fire Department had two relevant career ladders. The ranks in the Fire Suppression ladder, in ascending order, were Apprentice Fire & Rescue Officer, Fire & Rescue Officer, Second Driver, Driver Engineer, Lieutenant, Captain, and Battalion/Section Chief. The ranks in the Fire Prevention ladder were Apprentice Fire Prevention Officer, Senior Fire Prevention Officer, Fire Prevention Lieutenant, Fire Prevention Captain and Fire Prevention Section Chief. Plaintiffs challenge the 1986 and 1987 Second Driver exams, the 1987 and 1988 Driver Engineer exams, the 1986 and 1988 Lieutenant exams, and the 1987 Fire Prevention Lieutenant exam.

use an eligibility list as its main guide in making promotions from 1992 to December 31, 1995. All applicants who passed the promotion exam for a position would be placed on the list by order of score, with the highest-scoring applicant at the top. The department would promote from the top and work down, except for 20 promotions to Driver, 7 to Fire Lieutenant and 1 to Fire Prevention Lieutenant. Those 28 promotions would go to black officers who would not otherwise be chosen because their scores, while passing, were too low.

The district court refused to accept the proposed consent decree, finding that the plaintiffs were not likely to prevail at trial and that the proposed skip promotion remedy unnecessarily harmed other firefighters. The plaintiffs, still represented by the Black Fire Fighters' Association, appeal that refusal. The original defendant, the City of Dallas, has filed an amicus brief recommending acceptance of the consent decree. The district court decision is defended by an intervenor, a group of firefighters called the Dallas Fire Fighters' Association.

## II.

BFFA first challenges the intervenor's presence in this lawsuit, alleging that its members have no interest in the case. A decree's prospective interference with promotion opportunities can justify intervention.[2] The question whether the interest of

_____

[2]See Howard v. McLucas, 871 F.2d 1000, 1005 (11th Cir.), cert. denied, 493 U.S. 1002 (1989); Howard v. McLucas, 782 F.2d 956, 958-959 (11th Cir. 1986); Kirkland v. New York State Dep't of Correctional Servs., 711 F.2d 1117, 1128 (2d Cir. 1983), cert. denied, 465 U.S. 1005 (1984).

DFFA's members in promotions allows DFFA to dispute other features of the decree besides skip promotion is not before us, as DFFA focuses solely on the skip promotion provision.  While arguing against that provision, DFFA can challenge the underlying issue of the city's liability, because the degree of liability is relevant to whether a race-conscious remedial measure such as skip promotion is needed.[3]

BFFA also argues that other lawsuits DFFA has filed deny it the right to intervene in this suit.  The record shows that DFFA has sued the city to contest the skip promotions that the city voluntarily made before negotiating this decree.  That suit involves different facts from this one.  To the extent that lawsuit involves common legal issues, any potential adverse effects on that case from a consent decree in this case favor DFFA intervention.[4] DFFA properly appeared before the district court and properly appears before us.

### III.

A district court evaluating a proposed Title VII consent decree must determine whether the decree will have an unreasonable or unlawful impact on third parties if approved.[5]  A race-conscious

---

[3]See Maryland Troopers Ass'n v. Evans, 993 F.2d 1072, 1077 (4th Cir. 1993); Howard v. McLucas, 871 F.2d 1000, 1005 (11th Cir.), cert. denied, 493 U.S. 1002 (1989).

[4]See Martin v. Travelers Indem. Co., 450 F.2d 542, 554 (5th Cir. 1971); Atlantis Dev. Corp. v. United States, 379 F.2d 818, 828-89 (5th Cir. 1967).  See also 7A Charles A. Wright et al., Federal Practice & Procedure § 1908, at 302-05 (2d ed. 1986).

[5]Williams v. City of New Orleans, 729 F.2d 1554, 1559-60 (5th Cir. 1984) (en banc).

4

remedial measure such as the "skip promotion" system in the proposed decree receives strict scrutiny under the Equal Protection Clause.[6] At a minimum, this level of scrutiny requires that the remedy be narrowly tailored to remedy prior discrimination.[7] The Supreme Court has focused on five factors in analyzing race-conscious remedial measures: the necessity for relief, the efficacy of alternative remedies, the flexibility and duration of the relief, the relationship of the numerical goals to the relevant labor market, and the impact of the relief on the rights of third parties.[8] These factors support rejecting this decree.

The first two, necessity for relief and efficacy of alternative remedies, implement narrow tailoring and here expose its absence. The agreement requires 28 promotions of "qualified blacks," without regard to whether the person to be promoted is a victim of past discrimination.[9] The decree is not more specific

---

[6]City of Richmond v. J.A. Croson Co., 109 S. Ct. 706, 721-23 (1989) (4-Justice plurality); id. at 735-36 (Scalia, J., concurring). See also id. at 752 (Marshall, J., dissenting) (noting that "[t]oday, for the first time, a majority of this Court has adopted strict scrutiny as its standard of Equal Protection clause review of race-conscious remedial measures"). This standard applies to consent decrees. United Black Firefighters Ass'n v. City of Akron, 976 F.2d 999, 1008 (6th Cir. 1992); Davis v. City & County of San Francisco, 890 F.2d 1438, 1446 (9th Cir. 1989), cert. denied, 498 U.S. 897 (1990).

[7]Croson, 109 S. Ct. at 729; Wygant v. Jackson Bd. of Educ., 106 S. Ct. 1842, 1847 (1986) (4-Justice plurality). See also Maryland Troopers, 993 F.2d at 1076-77.

[8]See Croson, 109 S. Ct. at 729 (citing United States v. Paradise, 107 S. Ct. 1053, 1066 (1987) (4-judge plurality)).

[9]The key language in the provision of the settlement agreement provides: "Subject only to the number of promotional openings at the respective rank, every African-American appearing

5

even though BFFA represents a class of firefighters denied past promotions, and even though BFFA's counsel said at oral argument that some of those class members are still in the fire department. Further, another provision of the decree requires the city to pay money to "members of the [p]laintiff class," showing the parties' ability to identify past victims of discrimination. The broad skip promotion remedy in the decree is difficult to justify when the knowledge to narrow it seems readily available.[10]

The question, then, is the one posed by the fourth factor: does something in the relevant labor market justify skip promotion of "qualified blacks" rather than class members?[11] The record offers no guidance. The statistical evidence put forward by BFFA and the city at the fairness hearing showed that the percentage of

on the respective list of eligibles as 'passing' shall be promoted until the shortfall is eliminated." The provision goes on to say that "If as of December 31, 1995, the City has failed to satisfy its obligation to make sufficient additional promotions so as to eliminate the shortfall, the City will immediately promote a number of qualified blacks from existing eligibility lists to the ranks of Driver, Lieutenant and Fire Prevention Lieutenant necessary to remove the previously defined shortfall."

[10]See Croson, 109 S. Ct. at 733 (Stevens, J., concurring).

[11]The parties each argue half of this issue. BFFA argues in its brief that skip promotions are necessary because "[n]o other alternatives are available which would place the members of the Plaintiff class in the position they should have been but for this discrimination." The plaintiff class, however, does not necessarily benefit from this remedy. The City justifies skip promotions because without them "blacks do not gain the supervisory positions they should have gotten in the past but for the invalid exams which caused a disparate impact." "Blacks" are not the plaintiffs in this lawsuit. The line between the identity of the plaintiffs and that of the beneficiaries of the plaintiffs' lawsuit cannot be so easily blurred. See generally Williams, 729 F.2d at 1567-70 (Higginbotham, J., concurring).

blacks passing promotion exams was lower than the percentage of whites.[12] The city stipulated that those exams had not been validated in accordance with EEOC guidelines, and that several other parts of its promotion system had not been validated either. Neither the statistical evidence nor the city's stipulations establish any adverse effect of these selection devices on the group of blacks that would seek promotion during the time covered by the decree.[13]

Title VII allows a district court to order preferential relief for individuals who were not victims of discrimination.[14] The Department's behavior does not establish it as the kind of "particularly egregious"[15] defendant a court must force to promote

_____

[12]For example, on the 1987 Driver exam, 127 whites took the exam and 47 received "appointable" scores, defined as a passing score before adjustment for seniority or sanctions. 45 blacks took the exam and 12 received appointable scores. The percentage of blacks passing the exam, 26.67%, divided by the percentage of whites passing, 37.01%, is less than 80, a result that "will generally be regarded by the Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4 (1993). The plaintiffs presented similar statistical evidence about the other exams challenged.

[13]The stipulations begin: "Plaintiffs and Defendant believe that the evidence which supports these stipulations demonstrates that there has been a disparate impact on members of Plaintiff class constituting a prima facia [sic] case of a violation of Title VII by the City against members of the Plaintiff class. Plaintiffs and Defendant believe that this long standing disparate impact and the effects of this disparate impact require the use of affirmative race-conscious relief in order to provide an effective remedy." (emphasis added).

[14]Local 28 of Sheet Metal Workers v. EEOC, 106 S. Ct. 3019, 3053 (1986) (plurality opinion); id. at 3054 (Powell, J., concurring); id. at 3062 (White, J., concurring).

[15]Id. at 3054 (Powell, J., concurring).

7

minorities. Since this suit was filed, the department has eliminated the rank of Second Driver, reduced time-in-grade requirements for promotion to other ranks, and even made skip promotions. The city is a willing party to the effort to settle this lawsuit. This record falls short of the employment practices that have justified broad race-conscious remedies.[16] For example, in Sheet Metal Workers v. EEOC, the Court described a dozen year history of special training classes for whites, violations of court orders, and overt discrimination in the awarding of temporary work permits.[17] Similarly, International Brotherhood of Teamsters v. United States[18] described a pattern of lying to minority applicants and deliberately losing their applications.[19] This defendant does not rise to that level.

Nor do the specific promotion devices complained of by BFFA show a need for future relief to non-injured blacks. The parties' calculations about the appropriate number of skip promotions are based on the difference between the performance of blacks and whites on promotion exams, with small upward adjustments for the effect of seniority on scores and time-in-grade rules on the number of blacks eligible to sit for exams. These selection mechanisms can be made race-neutral, and other provisions of this decree do

_____

[16]See Maryland Troopers, 993 F.2d at 1077.

[17]Sheet Metal Workers, 106 S. Ct. at 3024-31.

[18]431 U.S. 324 (1977).

[19]Id. at 338.

so.  Nothing in the record warrants going beyond changing these selection devices.

BFFA urges the benefits of having more minorities in supervisory positions, such as providing minority perspectives to the department and creating minority role models.  The merit those purposes have in the abstract is outweighed by the harm of the way this decree implements them.  The benefits of having more minority supervisors does not justify imposing a racial classification with such a loose connection to remedying past discrimination.[20]

The two remaining factors address aspects of the impact of the decree.  The third factor, flexibility and duration of the remedy, is inconclusive.  The decree envisions making these promotions over a three year period.  The parties dispute whether the 28 promotions will be filled soon or will require the entire three years, and also dispute whether they will constitute the bulk of promotions during the period in which they are given.  This factor does not weigh for or against the remedy.

The last factor, impact of the relief, cuts against the remedy.  Plaintiffs correctly point out that a DFFA member denied a promotion is not in as bad a position as the victim of a layoff.[21]

---

[20]Croson, 109 S. Ct. at 723-24 (citing Wygant, 106 S. Ct. at 1848 (plurality opinion)).  See also John Hart Ely, The Constitutionality of Reverse Racial Discrimination, 41 U. Chi. L. Rev. 723, 727 n.26 (1974) ("[S]pecial scrutiny in the suspect classification context has in fact consisted not in weighing ends but rather in insisting that the classification in issue fit a constitutionally permissible state goal with greater precision than any available alternative.").

[21]Paradise, 107 S. Ct. at 1072-73 (plurality opinion).

Nor is the plaintiffs' interest in a particular promotion selection mechanism as strong as that of "the rights and expectations surrounding seniority."[22]  So long as the department ranks its employees' exam scores, however, a firefighter has an expectation that he can earn promotion through study.  That expectation is tangible enough that we cannot ignore the problems with the tailoring of this remedy.

## IV.

Because the skip promotion remedy does not withstand strict scrutiny, we affirm the district court's rejection of the decree.[23] We do not address the trial court's alternative holding that the decree as a whole could not stand because it was not "fair, adequate, and reasonable."[24]  The parties may negotiate another settlement, and the trial court's assessment of its reasonableness may change if DFFA finds a new agreement more palatable.  We leave that question for another day.

AFFIRMED.

---

[22]See Wygant, 106 S. Ct. at 1851-52 (plurality opinion).

[23]Williams, 729 F.2d at 1582 (5th Cir. 1984) (Wisdom, J., concurring in part and dissenting in part); Cotton v. Hinton, 559 F.2d 1326, 1331-21 (5th Cir. 1977).

[24]Williams, 729 F.2d at 1559.