**DALLAS FIRE FIGHTERS ASSOCIATION, et al.,**
**Plaintiff,**

v.

**CITY OF DALLAS, TEXAS, and Chief Dodd Miller, Defendants.**

No. 3:91–CV–1851–X.

United States District Court,
N.D. Texas,
Dallas Division.

April 20, 1995.

Hal Gillespie, David Watsky, for plaintiff.

Craig Hopkins, Frank Garza, for defendants.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

Now before the Court are the Plaintiff's Motions for Summary Judgment filed on April 1, 1994 and February 10, 1995. After consideration of the motions, the responses and the replies, the Court is of the opinion that the motions should be, and hereby are, **GRANTED,** with the exception of the "Chief Plaintiffs'" portion of the motion for summary judgment on their Title VII claims, such portion is **DENIED.**

### Background

This lawsuit challenges the promotion practices of the Dallas Fire Department ("DFD") as discriminatory based upon race and gender-conscious promotions made under the City of Dallas' ("The City") Affirmative Action Plan ("AAP"). More specifically, the Plaintiffs challenge certain "skip promotions [1]" which were made by the DFD in accordance with goals established by the City in its voluntary Affirmative Action Plan [2].

The Dallas Fire Fighters Association of Dallas filed suit on behalf of individual white and Native American firefighters who sought, but did not receive, promotions between 1991 and 1993.[3] In response to other challenges to its promotion program, the City has changed various features of the process, including eliminating the rank of Second Driver, reducing time-in-grade promotion eligibility requirements, and ending the practice of adjusting test scores upward for seniority. *Black Fire Fighters Association of Dallas v. City of Dallas,* 19 F.3d 992, 992 (5th Cir.1994) These actions were taken in addition to making the skip promotions at issue here.

The Dallas Fire Department's promotional process is not unlike many others across the nation. DFD does not make lateral hires from other fire departments, but fills positions above the entry level by promoting from within the department. Beginning with the entry level, current firefighter ranks are: fire and rescue officer, driver-engineer, lieutenant, captain, battalion chief, deputy chief,

1. The Dallas Fire Department promotes from an eligibility list. The rank of each fireman in line for promotion is based upon his/her test score on a promotional exam. In the past, the rank on the list has also been determined by adding a certain number of points for seniority. This is no longer the practice. A skip promotion occurs when an individual who ranks lower than another is promoted instead of the higher ranked applicant. In effect, the higher scoring applicant is skipped over in favor of an affirmative action promotion. The City of Dallas in their Affirmative Action Plan refers to this type of promotion as an "out of rank order promotion."

2. This action is a consolidation of three separate cases filed from 1991 to 1994. The initial action, 3:91–CV–1851–X, was filed in 1991 contesting seven skip promotions. As time progressed and other skip promotions were made counsel for the plaintiffs filed similar lawsuits. 3:92–CV–1550–D was filed in 1992 after the City made further skip promotions. The final consolidated case, 3:94–CV–1718–G, was filed after the City administered promotional exams in 1993 and subsequently used skip promotions to promote women and racial minorities.

This action is one of a series of actions which have been brought against the DFD concerning its promotional practices. In 1988, the Black Fire Fighters Association filed an action against DFD alleging that its promotional policies had a disparate impact on black firefighters. Plaintiffs in the instant action were intervenors in that action and contested a consent decree which included a skip promotion remedy. *See* 3:88–CV–2304–A; *see also Black Fire Fighters Association of Dallas v. City of Dallas,* 805 F.Supp. 426 (N.D.Tex.1992), *aff'd* 19 F.3d 992 (5th Cir.1994). Judge McBryde and the Fifth Circuit rejected the original consent decree based upon the finding that the skip promotion remedy in the consent decree violated the Equal Protection Clause. The action between the Black Fire Fighters Association and DFD was recently settled in a consent decree which, interestingly, does not contain a skip promotion remedy. *See* 3:88–CV–2304–A, October 21, 1994 Judgment. Indeed, one could surmise that the City is attempting to have this Court uphold a remedy rejected by both Judge McBryde and the Fifth Circuit.

Summary judgment motions were filed in each of the consolidated cases. The arguments and applicable law are essentially the same in each motion. This opinion's reasoning and decision applies equally to all the summary judgment motions filed in these actions.

3. Plaintiffs challenge promotions made in the Driver rank, the Lieutenant rank, the Captain rank and the Chief rank.

assistant chief and the fire chief. Among the various requirements for promotion for the ranks up to and including battalion chief is a promotional exam. Firefighters eligible for promotion are placed on a promotion list in descending order according to their scores on the exam. Unless a specific reason exists to pass over a particular candidate due to unsatisfactory job performance, disciplinary reasons, non-paramedic status or other reasons, members are promoted as vacancies occur by going down the eligibility list according to an individual's score on the exam.

Plaintiffs' complaints in these consolidated cases allege that all plaintiffs are now and were at the time the skip promotions were made, employed as firefighters by the Defendant City of Dallas. The Plaintiffs further allege that from 1991 to 1993, the City promoted various members of the Fire Department in the ranks of Driver, Lieutenant, Captain and Deputy Chief[4]. Each of the Plaintiffs[5], all of whom are white males, with the exception of Plaintiff Wallace J. Graves who is a Native American, applied for promotions by taking and passing the promotional exam. The Plaintiffs were passed over for promotion in favor of lower ranked individuals. Plaintiffs' complaint asserts that they were passed over solely because of race or gender in an attempt by the City and DFD to promote minorities in accordance with the City's Affirmative Action Plan. Plaintiffs allege that these promotions violate the Equal Protection Clause of the United States Constitution. The Plaintiffs also assert claims under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988. Plaintiffs further allege violation of the Equal Rights Clause of the Texas Constitution and Vernon's Ann.Civ.Stat. art. 5221k.

In Defendants' answer, the City denies that the skip promotions were made on the sole basis of sex or race. Further, the City denied that it acted in violation of either the United States Constitution, the Texas Constitution or any statutory prohibitions. The City asserts several affirmative defenses against the Plaintiffs. The City first asserts that the Plaintiffs have not been injured by a constitutionally defective policy or custom of the City. Second, the City asserts that some of Plaintiffs' claims are barred by the statute of limitations[6]. Finally, the City asserts that a number of the Plaintiffs lack standing because they would not have been promoted even if the skip promotions had not been made[7].

### Discussion

The parties have each filed motions for summary judgment. The Plaintiff moves for summary judgment on each of its claims. Defendants' motions have been denied in all respects by previous order of this court. For the reasons stated below, the Court finds that Plaintiff's Motion for Summary Judgment should be **GRANTED,** with the exception of the "Chief Plaintiffs'" portion of the

---

**4.** Plaintiffs' counsel has divided the plaintiffs into four distinct groups. The Driver Plaintiffs consist of the individuals who did not receive promotions to the Driver/Engineer rank due to skip promotions. These plaintiffs allege race and gender discrimination claims. The Lieutenant Plaintiffs consist of a group of individuals who did not receive promotions to the rank of Lieutenant. These plaintiffs allege race discrimination claims. The Captain Plaintiffs consist of individuals who were not promoted to the rank of Captain. These plaintiffs allege only race discrimination claims. The Chief Plaintiffs consist of the individuals who were not appointed to the rank of Deputy Chief. These plaintiffs allege race discrimination claims. This group of plaintiffs also pleaded age discrimination claims which were voluntarily dismissed during the pendency of the motions.

**5.** The Plaintiffs' Motion for Summary Judgment acknowledges that a number of plaintiffs named in the initial suit lacked standing. These plaintiffs are no longer pursuing claims in this action because they acknowledge that even absent the skip promotions complained of their standing on the promotion list would have prevented their promotion. (Plaintiffs' Motion for Summary Judgment at 1 n. 1).

**6.** Before the second case, 3:92–CV–1550–D, was consolidated into the lead case, Judge Fitzwater found that the Plaintiffs' claims in that action were not time-barred. This Court also finds that Plaintiffs' claims in this consolidated action are not barred by the statute of limitations.

**7.** Defendant Dodd Miller initially asserted that he was entitled to qualified immunity. However, the Joint Pretrial Order reveals that he is only being sued in his official capacity and therefore qualified immunity is no longer an issue.

motion for summary judgment on their Title VII claims, such portion is **DENIED**.

### I. Summary Judgment Standard

■ The movant in a summary judgment context must show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 170 (5th Cir.1991). The existence of a genuine issue of material fact is determined based on whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986). In other words, "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1504 (5th Cir. 1988). An issue is "material" if it involves a fact that might affect the outcome of the suit under the governing law. *Burgos v. Southwestern Bell Telephone Co.*, 20 F.3d 633, 635 (5th Cir.1994). At the summary judgment stage, a district court may not weigh the evidence or determine the truth of the matter but should only decide the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

■ The rules allocating the burden of proof guide a court in a summary judgment analysis, *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir.1991), and that allocation depends on the burden of proof that would apply at trial. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991). The nonmovant is not required to respond to the motion until the movant properly supports his motion with competent evidence. *Russ v. International Paper Co.*, 943 F.2d 589, 591 (5th Cir.1991), *cert. denied*, 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). However, once the movant has carried his burden of proof, the nonmovant may not sit idly by and wait for trial. *Page v. DeLaune*, 837 F.2d 233, 239 (5th Cir.1988). When a movant carries his initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir.1992). Although the nonmovant may satisfy this burden by tendering depositions, affidavits and other competent evidence,[8] "[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

■ Although a court must "review the facts drawing all inferences most favorable to the party opposing the motion," *Rosado v. Deters*, 5 F.3d 119, 122 (5th Cir.1993) (quoting *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)), the nonmovant may not rest on mere allegations or denials in its pleadings; in short, "the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). However, merely colorable evidence or evidence not significantly probative will not defeat a properly supported summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. The existence of a mere scintilla of evidence will not suffice. *Id.* at 252, 106 S.Ct. at 2512. When the nonmoving party fails to make the requisite showing and the moving party has met his summary judgment burden, the movant is entitled to summary judgment. FED.R.CIV.P. 56(c); *Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1119 (5th Cir.1992). The parties to this action have also stipulated that no genuine fact issues remain and that the only issues remaining are questions of law for the court to decide.

### II. Equal Protection Claim

■ The Plaintiffs in this action challenge the constitutionality of DFD's use of skip promotions in order to implement the Affirmative Action Plans adopted by the City [9]. When the constitutionality of an af-

---

8. *See* FED.R.CIV.P. 56(e).

9. The City initially adopted an Affirmative Action Plan in 1988. This plan expired after five years.

firmative action plan, either voluntary or court-ordered, is questioned, the Supreme Court has directed that the plan is subject to a strict scrutiny standard. *Black Fire Fighters Association of Dallas v. City of Dallas,* 805 F.Supp. 426, 429 (N.D.Tex.1992), *aff'd* 19 F.3d 992 (5th Cir.1994); *Edwards v. City of Houston,* 37 F.3d 1097, 1112 (5th Cir.1994). *See also Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Race-conscious relief, as is present here, must be justified by a compelling state interest and such relief must be narrowly tailored to further that interest. *Croson,* 488 U.S. at 505, 109 S.Ct. at 728. The Supreme Court has focused on five factors in analyzing race-conscious remedial measures: the necessity for relief, the efficacy of alternative remedies, the flexibility and duration of the relief, the relationship of the numerical goals to the relevant labor market, and the impact of the relief on the rights of third parties. *Black Fire Fighters Association of Dallas v. City of Dallas,* 19 F.3d 992 (5th Cir.1994) (citing *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 507, 109 S.Ct. 706, 729, 102 L.Ed.2d 854 (1989)).

### Necessity for Particular Relief

 In order to evaluate the City's assertions that the skip promotion relief is necessary, the Court must examine the purposes the skip promotions were to serve. The City asserts that the skip promotions are necessary to remedy the effects of past discrimination. In support of its assertions the City has submitted statistics concerning the rep-

resentation of minorities in the fire department ranks, lists of promotional eligibility exams [10] and the consent decree entered into between the Justice Department and the City in 1976. After examining the statistics concerning representation in the individual ranks, the court concludes that a statistical imbalance is present. However, the Court does not find that this naked statistical imbalance justifies skip promotions when the other factors, including the Dallas Fire Department promotional methodology discussed above,[11] counsel against their use. The Court specifically finds that reliance upon a 1976 consent decree primarily concerning hiring practices is not a strong enough basis in evidence to justify skip promotions in the 1990s.

### Efficacy of Alternative Remedies

The City's response to that 1976 consent decree and other discrimination within the City's employment practices implicates the second factor, efficacy of other alternatives. The City has implemented numerous changes since 1976. The City's track record over the last two decades indicates that the City has conscientiously attempted to eradicate all vestiges of discrimination in its hiring and promotional practices. The City has validated all promotional exams [12]. *Black Fire Fighters Association of Dallas v. City of Dallas,* 805 F.Supp. 426, 429 (N.D.Tex.1992). The City has provided for affirmative recruiting of minorities in the community. *Id.* Firefighters who fail the required paramedic course on their first attempt are given a second chance. *Id.* The City no longer adds points to the promotional exams for seniority,

In 1992, the City extended the adoption of this plan with some modifications. One of these modifications was a specific authorization for out of rank promotions which was not present in the original AAP. The City also slightly lowered the percentage goals relating to each identified minority group. Other than these changes, the current plan is substantially the same as the 1988 plan and it continues to be in effect until 1998.

**10.** Some of these lists are coded to indicate both the sex and the race of the individual eligible for promotion.

**11.** If promotions are made (absent negative factors, i.e. disciplinary problems, unsatisfactory job

performance, etc.) based upon ranking scores on a validated test, when "out of rank" promotions are made, based on race or gender, as here, that attribute becomes not one factor to be considered among many, but *the* factor.

**12.** "The Fire Department began validation efforts for its selection and promotion criteria and examinations in 1988. The first exams given after the validation was completed were in 1991." Affidavit of Robert Bailey at 2. The promotion tests at issue in the later consolidated cases, 3:92–CV–1550–D and 3:94–CV–1718–G, have been validated, yet the City still employs skip promotions to overcome the effects of a validated exam.

instead the eligible individuals are ranked solely on their score on a validated exam [13]. The City has implemented a tutoring program to help candidates study for exams. *Id.* at 429 n. 6. The City has settled a lawsuit with the Black Fire Fighters Association which memorializes these changes and expresses the City's intent that regular promotions will be made in a nondiscriminatory manner. The enumerated changes do not comprise the whole of the City's attempts to make its employment practices nondiscriminatory, or even the bulk. The changes listed are simply indicative of the City's corrective measures. The alternatives available which have been implemented are reducing the imbalance that exists in minority representation without trammeling the rights of nonminorities as the skip promotions do. The Court finds based upon the summary judgment record before it, that the City's successful use of other alternatives to achieve parity counsels against the continued use of skip promotions.

### Flexibility and Duration of Relief

■ To determine whether the skip promotion remedy is narrowly tailored, consideration of the flexibility and duration of the relief must be undertaken. *Edwards v. City of Houston,* 37 F.3d 1097, 1113 (5th Cir. 1994). In this case, application of this factor is inconclusive.

The City's initial Affirmative Action Plan was adopted in 1988. The original 1988 plan

---

13. On April 12, 1995, eight days ago, during the pendency of Plaintiffs motions, The City submitted a supplement to the motion for summary judgment. In this supplement, the City submitted the affidavit of an expert explaining the City's new policy of "banding." "Banding" was included as an express limitation in the 1993–1998 AAP. Although this concept was only adopted in the most recent AAP, the City's expert analyzed every promotion made under the custom and policy of skip promotions in order to prove that all the candidates promoted were essentially equally qualified. This type of statistical evidence smacks of hindsight justification. The Court wonders why if this was to be the practice for all the promotions after the adoption of the 1993 AAP why the City waited until this late date to show that they were skip promoting essentially equally qualified applicants who just happened to be minorities.

"Banding," as defined by the Defendants, is the statistical and measurement science practice of adding or subtracting points from a test score in order to reflect the "true test score" of the individual taking the test. In order to calculate the true score of an individual, the reliability of the test is multiplied by the standard error of measurement. The number received may either be subtracted or added to the test-taker's "observed score" in order to reflect the test-taker's true score. According to the Defendant's expert if the true score of a promoted individual and a skipped individual are within two standard error of measurements, the individuals are essentially equally qualified.

The City's expert states that this practice is necessary in order to compensate for the fact that no test is "perfectly reliable." However, Title VII does not require that a test be perfectly reliable, the test need only be job-related and adequately test an individual's aptitude for a certain position. Following this idea to its logical conclusion, if an individual had an observed test score of 99 and the standard error of measurement is 2, the individual's true test score, under the City's limitation, could be as high as 103 or as low as 95. However on a 100 point scale, this high true score would be impossible to achieve. The expert states in his example that Candidate A true score could be as low as 87, while Candidate B's true score may be as high as 88. Logically, the true scores could fall at the other end of the scale Candidate A's true score could be as high as 93, while Candidate B's true score could be as low as 82. If this were the case, the City's policy of skip promotions would result in the promotion of an individual whose true score is eleven points lower than the skipped individual's. The problem with the true score is that there is no way to tell if the candidate's true score would be higher or lower; there is no way to know with complete certainty what the ethereal true score is. However, the Court can know to a certainty what the observed score on a validated test was and the Court can discern that the applicants are ranked based on their observed scores.

Title VII does not require that a test be perfectly reliable, no one method of selecting employees is perfectly reliable. Subjective interviews are fallible; tests are fallible; test-takers are fallible. Title VII and the cases it has spawned did not intend nor did they mandate perfect employment decisions. The purpose of the statute and the cases was to mandate employment decisions unclouded by racial discrimination and age-old biases. The City's practice both creates new biases and enforces old stereotypes. Continued use of the skip promotion remedy may foster the misguided belief that minorities cannot compete on their own even on a validated test. This notion is just as pernicious and offensive as the archaic biases Title VII and affirmative action were designed to erase.

The Court does not find the City's untimely supplement to be persuasive evidence that bolsters or justifies the City's use of a skip promotion remedy that violates the Equal Protection Clause.

did not specifically provide for the use of skip promotions. The plan was adopted as a five year plan. However, in 1992, the City readopted the basic 1988 plan with the specific addition of "skip promotions." The AAP does not say how many skip promotions will be made in a given year. On the whole, this factor does not weigh for or against the skip promotions the City has carried out in the past or plans for the future. However, if the City simply plans to adopt the same AAP every five years, duration presents a problem.

**Relationship of the Numerical Goals to the Relevant Labor Force**

This factor concerns the goals set by the AAP with relation to the labor pool of qualified applicants. As stated above, the Dallas Fire Department does not hire laterally from other fire departments. Therefore, each rank is composed of those individuals qualified for promotion from the rank below. The promotional goals should be statistically related to the number of qualified applicants in each rank below. The affirmative action goals of the City's 1992 adopted AAP state that annual promotion goals are based on a ratio of African–American and Hispanics in the population of Dallas, Texas at a level not to exceed 40%. (Plaintiff's Summary Judgment Motion Exhibit A). The goals also show that representation goals for upper-ranks and executives are based on calculations of availability plus a five point acceleration factor when applicable. *Id.* However, the promotion goals for all ranks within the fire department above Fire & Rescue Officer are the same. The City in the 1992 AAP, set promotion goals across the board in all ranks above Fire & Rescue Officer at 23.4% for African–Americans, 16.6% for Hispanics and 10% for Females. The percentage of qualified individuals in each rank below necessarily fluctuates, the Court does not find how a single broad percentage goal for each rank can be adequately related to the number of qualified applicants in the appropriate feeder pool.

**Impact of Relief**

This last factor and its application to the skip promotions at issue, counsel against the race-conscious remedy which the City has adopted. The City argues that because no unqualified candidates were considered for promotion and the Plaintiffs were only denied an employment opportunity, not deprived of their existing jobs as in *Wygant*, 476 U.S. at 282–83, 106 S.Ct. at 1851 ("[d]enial of an future employment opportunity is not as intrusive as loss of existing job") (plurality opinion) that the impact on the Plaintiffs is not significant. Certainly, "a DFFA member denied a promotion is not in as bad a position as the victim of a layoff." *Black Fire Fighters Association of Dallas v. City of Dallas,* 19 F.3d 992 (5th Cir.1994). However, the City's interest in race-conscious promotion policies is not as strong as the rights and expectations surrounding seniority. *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. at 281–85, 106 S.Ct. at 1851–53. DFD has validated its promotional exams, it no longer adjusts the scores for seniority and it has established policies and customs which are aimed at racial parity. The Plaintiffs have had their promotional opportunities affected and many are not eligible to take upcoming promotional exams. They would have been eligible for these exams had the City promoted according to its own promotional ranking. The policy of ranking scores on validated tests creates an expectation in *all* firefighters that promotion can be earned by studying for the test. The City should not undermine this expectation with skip promotions that are not narrowly tailored.

For the above reasons, the Court finds that the City's policy of skip promotions in the fire department is not narrowly tailored and the Plaintiff's motion for summary judgment, as to the Equal Protection violation, is granted.

■■■ The Equal Rights Clause of the Texas Constitution provides that all free men have equal rights. TEXAS CONST. Art. 1 § 3. Texas cases echo federal standards when determining whether an individual's Equal Protection rights have been violated. *Rose v. Doctors Hospital,* 801 S.W.2d 841, 845 (Tex. 1990). Therefore, for the reasons stated above, Plaintiffs' motion for summary judgment on the Equal Rights Clause claim is also granted.

### § 1983 Claims

■ The City has never argued that the AAP and its individual components do not represent the policy or custom of the City of Dallas. Instead, it relied upon the argument that the skip promotions did not violate the Equal Protection Clause and therefore was not constitutionally defective. The City's AAP, and specifically that provision which provides for skip promotions, is a policy or custom related to the City's goal of achieving a workforce which reflects the diversity of the community it serves. The past practice of making skip promotions without the benefit of a specific AAP provision authorizing those provisions was a custom related to the City's goal to achieve a diverse workforce as well. As discussed above, the City's policy of making skip promotions violated the Plaintiffs' Equal Protection rights and deprived them of federally protected rights [14]. The City adopted and carried out the plan and its individual provisions under its municipal authority and color of state law. Accordingly, the Plaintiffs' motion for summary judgment on the § 1983 claim, is granted.

### III. Title VII Claims

■ The Plaintiffs also argue that the skip promotions which the City has made in the past and those it intends to make in the future, violate Title VII. The Supreme Court in *Johnson* articulated a two prong test for determining whether a race or gender-conscious remedy comports with Title VII. *Edwards v. City of Houston,* 37 F.3d 1097, 1110 (5th Cir.1994) (citing *Johnson v. Transportation Agency of Santa Clara,* 480 U.S. 616, 635 n. 13, 107 S.Ct. 1442, 1454 n. 13, 94 L.Ed.2d 615 (1987). The first issue is whether the consideration of sex or race of the applicants was justified by the existence of a manifest imbalance that reflected under-representation of women or minorities in traditionally segregated job categories. *Johnson* at 631, 107 S.Ct. at 1452. Next, the Court must consider whether the Fire Department's race and gender-conscious skip promotions unnecessarily trammeled on the rights of male nonminority employees or created an absolute bar to their advancement. *Id.* at 637–38, 107 S.Ct. at 1454–55.

### Is a Manifest Imbalance Present?

■ In determining whether an imbalance exists that would justify taking race or gender into account, a comparison of the percentage of minorities in the employer's workforce with the percentage of qualified minorities in the appropriate labor market is required. *Johnson* at 631–32, 107 S.Ct. at 1452. If a job requires training, the comparison should be with those minorities or females in the labor force who possess the relevant qualifications. *Edwards v. City of Houston,* 37 F.3d 1097, 1110 (5th Cir.1994) (citing *Johnson v. Transportation Agency of Santa Clara,* 480 U.S. 616, 631–32, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615 (1987)). The manifest imbalance requirement is not the same as a prima facie case against an employer. *Id.*

■ The City has submitted statistical analyses of each rank of the fire department above Fire & Rescue officer. The City has analyzed the number of total employees for each rank, the number of employees by racial or cultural classification, the percentage of employees in a certain rank by race or gender, the percentage and number of minorities available for promotion and the actual percentage and number of minorities promoted. These numbers seem to be raw statistics with no explanation other than the circular argument that there is a manifest imbalance because there was past discrimination which needs to be remedied and there is past discrimination because we can point to a manifest imbalance. The Plaintiffs argue that the manifest imbalance in upper ranks of the fire department is caused by minorities' poor scores on the promotional exams which can be linked to the City's practice of hiring minorities despite their lower scores on the entrance test scores. The Court finds that the City has shown that a manifest imbalance exists, but that the statistics do not purport to explain why the imbalance is present.

---

**14.** The Court emphasizes that only the policy of skip promotions violates the Equal Protection Clause. Nothing in this opinion should be construed as a finding that the whole of the AAP violates any constitutional or statutory prohibition.

However, the City does not bear the burden of explaining the manifest imbalance, it must merely show that one exists.

### Do the Skip Promotions Unnecessarily Trammel the Rights of Nonminorities?

■ The Court must now analyze whether the race and gender-conscious skip promotions unnecessarily trammel the rights of nonminorities or create an absolute bar to their advancement.

The Court finds that an absolute bar to the advancement of nonminorities has not been created. Therefore, the only issue is whether the skip promotions unnecessarily trammel the Plaintiffs' rights.

The leading case in determining whether or not a race or gender-conscious remedy comports with Title VII is *Johnson v. Transportation Agency of Santa Clara*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). In *Johnson*, the Santa Clara County Transit District Board promoted, in accordance with an affirmative action plan, a female employee with a lower qualifying score over a male employee who had scored two points higher on the interview scale. *Johnson* at 622, 107 S.Ct. at 1447. During the selection process, both applicants cleared the initial hurdle of being deemed qualified.[15] *Id.* Both applicants were included in a group of applicants interviewed by a two-person panel. *Id.* Those applicants who scored above 70 on this interview were certified as eligible for selection by the appointing authority. *Id.* The next step of the process was an interview by three Agency supervisors who made a final recommendation.[16] Despite, the panel's recommendation of the male applicant, the Affirmative Action Plan Coordinator recommended to the Director of the Agency that the female applicant be promoted. *Id.* at 622–25, 107 S.Ct. at 1447–48. The Director

of the Agency heeded that recommendation and promoted the female applicant. Subsequently, the male applicant filed a lawsuit.

The Supreme Court held that the Plan used by the Transit Board was permissible because the sex of the applicant was but one of numerous factors taken into account in arriving at the decision. "The Agency earmarks no positions for anyone; sex is *but one of several* factors that may be taken into account in evaluating qualified applicants for a position." *Johnson* at 641, 107 S.Ct. at 1456. The Supreme Court also stated that the decision to consider sex as one factor among many was made pursuant to an affirmative action plan that represented a moderate, flexible, case-by-case approach. *Id.*

The case before this Court is factually distinguishable from the *Johnson* case. While the legal standards set out in *Johnson* are applicable to this case, the promotional methodology at issue here is starkly different. The Dallas Fire Department utilizes two criteria in making its promotional decisions, a passing score on an exam and a ranked order of all passing scores. In the positions at issue, with the exception of the chiefs' positions[17], there is no evidence of a subjective interview, there is no evidence of a individual evaluation of the applicants to be promoted, there is no evidence of an evaluation of the applicants based upon their past job performance, experience or personal attributes. All of these factors are present in *Johnson*. In this case, there is evidence that race has become a trump card in the hands of a municipal government in its quest for a diverse workforce in the shortest amount of time. To paraphrase George Orwell, the City's argument seems to be that all factors are equal, but some factors are more equal

---

**15.** Initially, twelve employees applied for the promotion, only nine were deemed qualified for the position.

**16.** In addition to these interviews, written evaluations were compiled on each of the applicants.

**17.** The Deputy Chief promotion was made as an appointment by Chief Dodd Miller. Affidavit testimony provided by Dodd Miller indicates that he hired Robert Bailey based upon his belief that

Bailey was capable of performing the job responsibilities of the position of Deputy Chief, and he was recommended for the position by Chief Dodd's executive staff. In addition Dodd testified that the appointment was within his discretionary authority and made pursuant to the AAP. Evidence shows that, in this case, race was simply one factor among many. Accordingly, the Chief Plaintiffs' motion for summary judgment on their Title VII claim is denied.

than others [18].

In its implementation of the City's custom and policy of making skip promotions, the Dallas Fire Department allowed race and gender to become *the* factor in making promotional decisions instead of but one factor among many.

■ The Court acknowledges that "there is no precise formula for determining whether or not an affirmative action plan trammels the rights of [nonminorities]." *In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525, 1540 (11th Cir.1994). When reviewing affirmative action plans involving race or gender-based entry-level hiring goals, the Supreme Court has noted that the impact on nonminorities is diffused, spread across all those in society who might desire the entry-level position. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Entry-level hiring goals, while burdening some innocent persons, do not impose the same type of injury on nonminorities as that imposed by the use of race or gender to determine layoffs. *Id.* at 282, 106 S.Ct. at 1851. Because layoffs impose the entire burden on particular individuals, often causing serious disruption to their lives, the Supreme Court has determined that this burden is too intrusive. *Id.* at 283, 106 S.Ct. at 1852. These two situations present the extremes of employment decisions based on race or gender. The instant situation however, does not neatly fall at one end of the spectrum or the other.

This case involves neither hiring or layoffs, but instead concerns skip promotions made under the City's affirmative action plan. The Eleventh Circuit has held that a promotion situation lies between entry-level hiring and layoffs in terms of the burden permitted on nonminorities. *In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525, 1541 (11th Cir.1994). This Court agrees with that holding. The burden of the City of Dallas' skip promotion policy is not diffused throughout society, nor even diffused throughout the entire fire department. Instead, this policy resembles the layoff situation because only specific individuals are burdened.

■ The Court does not find that in order to unnecessarily trammel on nonminorities rights, there must be a firing or a layoff decision based upon race or gender. *See In re Birmingham Reverse Discrimination Employment Litigation*, 20 F.3d 1525, 1541 (11th Cir.1994). As stated above in the discussion of the Equal Protection claim, this Court finds that the promotional goals adopted by the City in its AAP are not reasonably related to the applicable pools of qualified employees for each job classification in the Fire Department ranks.[19] A single percentage for the promotional goal in each rank seem to be arbitrarily-selected. The Court finds no evidence that the City at-

---

18. GEORGE ORWELL, ANIMAL FARM (1946).

19. As stated above, the Dallas Fire Department does not hire laterally from other fire departments.

Therefore, each rank is composed of those individuals qualified for promotion from the rank below. The promotional goals should be statistically related to the number of qualified applicants in each rank below. The affirmative action goals of the City's 1992 adopted AAP state annual promotion goals are based on a ratio of African–American and Hispanics in the population of Dallas, Texas at a level not to exceed 40%. (Plaintiff's Summary Judgment Motion Exhibit A). The goals also show that representation goals for upper-ranks and executives are based on calculations of availability plus a five point acceleration factor when applicable. *Id.* However, the promotion goals for all ranks within the fire department above Fire & Rescue Officer are the same. The City in the 1992 AAP, set promotion goals across the board in all ranks above Fire & Rescue Officer at 23.4% for African–Americans, 16.6% for Hispanics and 10% for Females. The percentage of qualified individuals in each rank below necessarily fluctuates, the Court finds that a single broad percentage goal for each rank cannot be adequately related to the number of qualified applicants in the appropriate feeder pool because the number of qualified minorities fluctuates within each rank.

The 1988 AAP promotional goals were also a static set of percentage goals for each rank. In all ranks above Fire & Rescue Officer (including the now-eliminated rank of Second Driver), the City established promotional goals of 25% for African–Americans, 10% for Hispanics and 10% for Females. The Court finds the same problem with this single broad percentages as it found with the 1992 goals. Neither set is adequately related to each minority's representation in the qualified pool below.

tempted to adopt a promotional goal which is proportionally related to the representation of qualified minority applicants in each feeder pool.

In the Court's view, the City's policy of skip promotions fails under Title VII because the single, arbitrary percentage goal for every rank coupled with the City's failure to consider race or gender as one of several factors, instead of considering it as the factor, unnecessarily trammels the rights of nonminority firefighters by unduly restricting their promotional opportunities. The failure to be promoted, caused by these two actions by the City, no doubt affected the earnings of the Plaintiffs, who are likely dependent on wages for their day-to-day living. *In re Birmingham Reverse Discrimination Employment Litigation,* 20 F.3d 1525, 1542 (11th Cir.1994), *citing, Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 281, 106 S.Ct. 1842, 1851, 90 L.Ed.2d 260 (1986). The failure to be promoted, or even a delay in receiving a promotion, also likely affects earnings long into the future under whatever retirement, benefits or time-in grade system the City provides for DFD employees.

The Court holds that the skip promotion policy and custom of the City of Dallas' Affirmative Action Plans violates Title VII because it unnecessarily trammels the rights of nonminority firefighters by considering race or gender as the factor in a promotion instead of one factor among many and by establishing a single percentage goal for all ranks of the fire department instead of a promotional goal which was proportionally related to the representation of qualified minorities in each feeder pool. Accordingly, the Plaintiffs' motions for summary judgment, with the exception of the "Chief Plaintiffs", on the issue of Title VII violations are granted. As to the "Chief Plaintiffs, the motion for summary judgment on their Title VII claims is denied.

### Article 5221k Claim

 Article 5221k, Vernon's Tex.Civ. Stat. is basically identical to and has been interpreted in conformance with Title VII. *Chevron Corp. v. Redmon,* 745 S.W.2d 314, 316–17 (Tex.1987). Accordingly, for the rea-

sons discussed above with respect to Title VII, Plaintiffs' motions for summary judgment, with the exception of the Chief Plaintiffs, on the issue of Article 5221k violations are granted.

### Conclusion

For the above reasons, the Plaintiffs' motions for summary judgment are granted with the exception of the Chief Plaintiffs' portion of the motion for summary judgment, such portion is denied. The Court finds that the City's custom and policy of skip promoting minorities over the Plaintiffs in this action violated the Plaintiffs' constitutional rights under the Equal Protection Clause. The Court also finds that the policy violated the Plaintiffs' rights guaranteed under the Texas Constitution's Equal Rights Clause. The Court also holds that the skip promotion policy embodied in the City's Affirmative Action Plan, with the exception of the promotion made in the position of Deputy Chief, violates both Title VII and Article 5221k.

**SO ORDERED.**